IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ERNEST GLENN VICK,

    Petitioner,                    No. CIV S-02-0652 LKK JFM P

    vs.

D. RUNNELS, WARDEN,

    Respondent.               FINDINGS AND RECOMMENDATIONS

                                /

        Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges his 1999 conviction on charges of committing a lewd act upon a child.  Petitioner raises three claims that his constitutional rights were violated by the ineffective assistance of counsel.  Petitioner also alleges he was denied due process by the denial of his motion for new trial and that he suffered cruel and unusual punishment as a result of the refusal to strike one of petitioner's prior convictions for sentencing purposes.[1]

/////

---

[1] This action is proceeding on petitioner's second amended petition, filed June 6, 2003.

1

FACTS[2]

Amanda S. lived in Los Angeles with her father until she was 13; she then moved to Amador to live with her mother, Shannon S., and her two sisters, Katie and Robin. Shannon's mother is Cathy V., who is married to [petitioner]. Cathy's father is James K. All of these relatives live in Amador County.

On Amanda's 14th birthday, her mother gave her a party. Family members and a few friends came. After the party Amanda and Katie left with [petitioner]. They were going to spend a few days with him and help him chop wood the next day. Cathy Vick was out of town.

Amanda watched television with [petitioner] while Katie was in the playroom. A porno commercial came on and [petitioner] asked her if she liked to watch them. Amanda said, no, she thought they were dumb. [Petitioner] said he liked to watch them; he thought they were fun.

Amanda went to bed, wearing an Army shirt, her bra and underwear. She woke up later when the bedsheets were moving. [Petitioner] was beside her bed; he touched her shoulder and put his hand under the sheets. He moved his hand to her hip and put his other hand on her breast. He massaged her breast for 30 seconds or a minute. Amanda told him to stop and [petitioner] said he just wanted to kiss them. Amanda put a pillow over her breasts and [petitioner] put his head on the pillow. Amanda told him to go away because she was tired. [Petitioner] said okay and left.

Amanda awoke again when the door opened and [petitioner] came in. He touched her again. One hand was on her breast and the other was near her underwear. Amanda told him she was tired and had a headache. [Petitioner] left and came back with aspirin and a cup of water. [Petitioner] tried to touch her again. Amanda told him she was really tired and wanted to sleep, so he left.

The next morning Amanda went to Katie's room and told her what happened and that she wanted to leave. According to Katie, Amanda said, "I think Ernie tried to rape me last night." Katie called her great-grandfather and asked him to pick them up. Amanda was crying as Katie made the call. As Amanda was packing to leave, [petitioner] came in and asked her, "Is this about last night?" Amanda said no, she just had to leave.

---

[2] The facts are taken from the opinion of the California Court of Appeal for the Fifth Appellate District in People v. Vick, No. C034155 (February 28, 2001), a copy of which is attached as Exhibit C to Respondent's Answer, filed August 6, 2003 ("Opinion").

/////

  Katie's great-grandfather called Shannon and told her what happened. Shannon picked up the girls later when she got off work. A few days later, the incident was reported to the police.

  Amanda admitted she lied about "dumb stuff" like having to do chores to avoid going with friends. She did not want to report the incident because she knew it would be "a long thing" and she just wanted to forget it. The incident caused a split in the family.

  Leslie F. testified her parents divorced when she was very young and her mother married [petitioner]. Leslie recalled an incident when [petitioner's] daughter Michelle had been visiting. After the visit, they drove Michelle home. On the way back, [petitioner] exposed his penis. He took Leslie's hand and had her stroke his penis. Leslie was seven. Finally, [petitioner] said he had better put it away before they had an accident.

  [Petitioner] would come into Leslie's room and fondle her. He did this at least 30 times. She asked Michelle to share her room in hopes that it would stop. When she was in the fifth grade, Leslie was sent home from school sick. [Petitioner] was at home and he took off her shirt and rubbed lotion on her breasts. She told him to stop that she did not like it. [Petitioner] got angry. After Leslie reported the incident to her teacher, the police and courts got involved. On another occasion, [petitioner] came into Leslie's room nude and laid on top of her. He said, "If you were older, do you know what I could make you do?" She responded, "You could make me have a baby." [Petitioner] said, "Yes."

  Leslie testified that after 17 years the molestation still affected her. For a long time she blamed and hated herself. She felt guilty for breaking up the family and once tried to kill herself. In 1993, she called [petitioner] and expressed her feelings. He was surprised.

  The defense case attacked the credibility of Amanda and Leslie. Three of [petitioner's] children testified they did not recall Leslie ever asking anyone to share her room and Leslie never told them [petitioner] did anything inappropriate. [Petitioner's] son testified Amanda tried to act tough. The morning after the alleged molestation, she appeared her normal "attitudy self."

  Shannon testified Amanda lied about typical teenage stuff. She had always caught Amanda in her lies and grounded her. Katie's great-grandfather claimed Amanda had an "L.A. attitude." She lied about everything and he did not trust her. Amanda no longer stayed with him as he had ill feelings towards her and was afraid she would make a similar charge about him. Cathy Vick said Amanda was "difficult;" she told stories and embellished a bit.

Katie's great-grandfather testified the morning he went to [petitioner's] to pick up the girls, he talked to [petitioner] and Amanda for half an hour. Amanda acted normal. Amanda saw [petitioner] at bowling the next day and there was nothing unusual.

The defense called Carolyn Fowle, a Ph.D. in clinical psychology. She performed a psychological evaluation of [petitioner]. His history included a 1982 conviction for child molestation. Fowle testified there was nothing in the psychometric evidence to indicate [petitioner] was sexually exploitive or preoccupied. There was no evidence of a need for power and control. Indeed, [petitioner] had a respect for honesty and a self-righteous morality. She found no evidence of traits that would make him a sexual molester. In her expert opinion, there was no evidence from the psychometric or psychological evaluation to indicate that [petitioner] was predisposed to commit sexual offenses or was sexually exploitive of children, even considering his conduct 17 years earlier.

On cross-examination Fowle was asked about a diagnosis of [petitioner] in 1961 that found him to be a sexual psychopath not amenable to hospital treatment. He was found to have a sociopathic personality disturbance and a sexual deviation (voyeurism). Fowle explained that 38 years ago there was no valid objective classification system for mental disorders. The prior diagnosis did not change her opinion.

[Petitioner] had described the incident involving Leslie as only two instances of rubbing lotion on her. Fowle found no evidence [petitioner] was a true pedophile; true pedophiles are resistant to change. She tended to believe [petitioner] when he said he was not guilty. She conceded there was a valid basis for the diagnosis of voyeurism as [petitioner] had eight arrests for voyeurism. Fowle suspected [petitioner] may have been a peeping Tom.

[Petitioner] denied touching or molesting Amanda. He could not think of a reason she would lie. At the party he spoke with Shannon about Amanda's smoking. When they got to his house, Amanda was on the telephone for 45 minutes; he had to tell her three times to get off. But he claimed there was no friction. He saw Amanda drinking something near the liquor cabinet. He asked her about it, but determined it was cream soda. He denied there was a porno commercial or that he asked Amanda about pornography. He fell asleep watching television and awoke at 2:00 a.m. He checked on Amanda, who said she had a headache. He brought her aspirin, but did not touch her or the bed. He was aggravated she did not take the aspirin. Later that morning Amanda acted normal, as she did the next day at the bowling alley.

[Petitioner] had admitted the charges involving Leslie. He

received three years probation and attended Parents United for two years. He also had two years of private counseling. He was later convicted of burglarizing Leslie's mother's house. He pled guilty and served two years in prison. He denied masturbation with Leslie; he denied everything except twice putting lotion on her. He admitted he had been a voyeur, but claimed he stopped over 10 years ago.

[Petitioner] moved for a new trial on various grounds, including newly discovered evidence. Amanda's mother, Shannon, had written the judge questioning Amanda's story. Amanda had filed a complaint with Child Protective Services (CPS) against Shannon's new husband, alleging child abuse and drug abuse. After some investigation, including interviews with Shannon's other daughters, the case was closed. Shannon did not believe [petitioner] should serve any time. The defense also produced a declaration from Shannon's husband, reciting the allegations and that CPS found them unfounded.

The court denied the motion for new trial. The court was troubled that the CPS investigation had not included an interview with Amanda. It found the new evidence was cumulative as there was extensive cross-examination at trial about Amanda's lying. Further, there was no evidence of a motive for Amanda to lie and her testimony was corroborated by Katie and Leslie. The court found Amanda was credible while [petitioner's] testimony was full of denials. He was evasive and nonresponsive in his demeanor. The court concluded there would be no different result on retrial.

Several witnesses testified on [petitioner's] behalf in connection with his motions to reduce his offense to a misdemeanor under Penal Code section 17, subdivision (b), and to strike a prior pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497. The court denied both motions and sentenced [petitioner] to prison for 25 years to life.

(People v. Vick, slip op. at 2-8.)

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

>  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

>  (2) resulted in a decision that was based on an unreasonable

5

determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

/////

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. Williams, 529 U.S. at 413. A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

   A. <u>Ineffective Assistance of Counsel:  Decision to Call Psychologist</u>

6

Petitioner's first claim for relief is that he received constitutionally ineffective assistance of counsel by defense counsel's decision to call a psychologist to testify to lack of propensity, leading to the introduction of facts concerning petitioner's personal history. This claim was rejected by the state appellate court, finding that petitioner failed to show that the omissions of defense counsel involved a critical issue, or that the case might have been handled more effectively. (Opinion, at 10.) The state court found the decision to call Dr. Fowle to testify was a tactical one[3] and refused to second-guess the decision. (Id. at 10-11.)

In order to prevail on a claim of ineffective assistance of counsel, petitioner must show two things, an unreasonable error and prejudice flowing from that error. First petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland v. Washington, 466 U.S. 688 (1984). The court must determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. Id. at 690. "Review of counsel's performance is highly deferential and there is a strong presumption that counsel's conduct fell within the wide range of reasonable representation." United States v. Ferreira-Alameda, 815 F.2d 1251 (9th Cir. 1986).

Second, petitioner must prove prejudice. Strickland at 693. To demonstrate prejudice, petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. The focus of the prejudice analysis is on "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506

---

[3] "Counsel may have believed that given [petitioner's] prior conviction for molestation, it was important to show he was not predisposed to molest children. Counsel may have believed Fowle's testimony, with its aura of scientific accuracy, would be persuasive. Further, counsel may have believed that Fowle could adequately address the 1961 diagnosis by calling into question the classification methods in place then and that the jury would recognize voyeurism as a relatively minor sexual deviancy unrelated to molestation." (Opinion at 10.)

U.S. 364, 372 (1993).

Petitioner challenges the wisdom of trial counsel's calling Dr. Fowle to the stand in an effort to demonstrate petitioner showed no psychological or sexual problem under the reasoning of People v. Stoll, 49 Cal.3d 1136, 1161 (1989). Stoll held that a California judge could not exclude an expert opinion offered by a psychologist, who had examined and tested a defendant accused of child molestation, demonstrating that the defendant's personality did not fit the "profile" of a child molester. Id. at 707-14. The court reasoned that such testimony was admissible as character evidence tending to show that the defendant had not committed the crime. Id. at 707-08.

The state appellate court found this was a tactical decision on the part of counsel which counsel for petitioner also recognized: "[t]he decision to open the door of character testimony is a familiar dilemma for defense counsel." (Pet.'s 2nd Am. Pet. at 13.) However, a tactical decision by counsel with which the defendant later disagrees is not a basis for a claim of ineffective assistance of counsel. Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984); United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981). "Counsel's tactical decisions are 'virtually unchallengeable.'" Furman v. Wood, 190 F.3d 1002, 1006 (9th Cir. 1999) (citing Strickland, 466 U.S. at 687). Faced with the testimony of Leslie, whose victimization resulted in petitioner's 1982 conviction for lewd act with a child, as well as the testimony of the present victim, Amanda, it was not unreasonable for trial counsel to attempt to find additional ways to defend petitioner, notwithstanding how poor the choice may appear with benefit of hindsight.

Although petitioner suggests trial counsel could have portrayed petitioner as "vulnerable to false accusations because of his prior conviction, a single instance of aberrant behavior," (Am. Pet. at 13), it is unlikely the jury would have believed that, particularly in light of Leslie's strong testimony concerning multiple incidents of molestation. As noted by respondent, petitioner offered no explanation as to why Amanda would lie about the alleged molestation and offered no evidence that Amanda even knew about petitioner's prior molestation

8

conviction. (RT 1208, 1213.)

However, even if petitioner could demonstrate the ineffective assistance prong on this claim, petitioner cannot demonstrate that, but for counsel calling Dr. Fowle, the result of the trial would have been different. The Supreme Court has defined prejudice in the context of a claim of ineffective assistance of counsel as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u>

/////

In the instant case, there was strong testimony by Amanda. Her accounting of the events of the night in question was consistent. Amanda's sister, Katie, testified that Amanda reported to Katie the actions of petitioner the very next morning. In addition, the testimony of Leslie, the prior molestation victim, was damaging. By contrast, without Dr. Fowle's testimony, petitioner's defense would have consisted of petitioner's denials, his son's statement that Amanda did not exhibit any unusual behavior the following morning, Amanda's mother's testimony that Amanda lied about "typical teenager stuff," and Mr. Kerr's statement that Amanda was acting normal the following day.

Given the testimony of Amanda and Leslie herein, this court's confidence in the outcome of the trial is not undermined, even had Dr. Fowle not been called to the stand. The California Court of Appeal did not apply <u>Strickland</u> unreasonably. Consequently, this court must affirm the state court's rejection of petitioner's claim of ineffective assistance of counsel.

B. <u>Ineffective Assistance of Counsel: Failure to Seek Limiting Instruction</u>

Petitioner's second claim for relief is that he was denied effective assistance of counsel by the failure to ask for a jury instruction limiting the jury's use of the information derived from the cross-examination of petitioner's psychologist. The state court noted that the record was silent as to counsel's reasoning for failing to seek such a limiting instruction but

found there could be a satisfactory explanation for not seeking one. (Opinion at 11.)

The trial judge met with defense counsel and the prosecution prior to closing argument to determine what jury instructions would be presented. (RT 980-97.) Petitioner's trial counsel did not request a limiting instruction regarding the use of petitioner's 1961 diagnosis. (RT 980-97.) The trial judge stated that the purpose of issuing the limiting instruction CALJIC 2.09 was that it referred to California Evidence Code § 1108[4] propensity evidence. (RT 981.) The trial judge took care, in light of conflicting state appellate court decisions at the time of trial, concerning the use of CALJIC 2.50.01 due to the preponderance of evidence standard of proof for propensity evidence versus the higher reasonable doubt standard of proof for the elements of the crime charged. (RT 984-85.) The judge initially modified CALJIC 2.50.01 to reinforce the reasonable doubt standard, but since that language was provided in CALJIC 2.09, the trial judge asked counsel whether they would stipulate to not giving either CALJIC 2.50.01 or 2.50.02. (RT 985.) Both counsel agreed. (RT 985-86.) Following the hearing to determine the jury instructions, counsel made their closing arguments. (RT 997.) During closing argument, the prosecution referred to the 1961 sexual psychopath diagnosis twice:

> Now, Ernie has some kind of a sexual problem. There's just no question about that. I can't see how anybody who's been in this room for the . . . three days we've been here could not know and believe in your bones that there's something wrong with Ernie. We've heard about the 1982 case. We've heard from the psychologist which evaluated him, which in turn, brought out there had been another diagnosis in 1961 of a sexual psychopath. We know that he was convicted of first degree burglary in 1986. So there's something not right about Ernie.

(RT 1007-08.) The prosecutor later argued the credibility of Dr. Fowle and petitioner:

---

[4] Section 1108(a) states:
> In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352.

Cal. Evid. Code § 1108(a). The purpose of § 1108 is to allow the jury to consider prior sexual offenses as evidence of a defendant's propensity to commit the charged sexual offense. See People v. Fitch, 55 Cal.App.4th 172 (1997).

> It is unreasonable to say that somebody is not predisposed to being a sex offender; that they don't fill that profile when they have already been convicted of being a sex offender. That it was unreasonable of her, after she formed her opinion, and we sent her documents that in 1961 he was diagnosed as a sexual psychopath, and she says that does not change her opinion. And finally, that he didn't tell her about that. Remember, he's honest. Ernie's honest. Ernie tells people what's going on. Ernie was honest with you. Ernie's a straight-forward kind of guy. But that, he didn't tell her. Maybe he didn't tell her everything. Maybe he didn't tell her all about Leslie. Maybe he didn't tell her all about Ernie. And so her opinion is only as good as the facts she has, and her own assessment of the facts. And I'm telling you squarely that that opinion is just plain unreasonable, and you are completely free to reject it.

(RT 1013-14.)

Before the jury was adjourned to deliberate, the trial judge gave the jury some new instructions and re-read some instructions that he felt were important. (RT 1044.) One of these instructions addressed the prior sexual offenses evidence:

> Evidence has been introduced for the purpose of showing the [petitioner] engaged in a sexual offense on one or more occasions other than that charged in this case. "Sexual offense" means a crime under the laws of the state or of the United States that involves any of following:
>
> . . . any conduct made criminal by Penal Code Section 288(a). The elements of this crime is set forth elsewhere in these instructions.
>
> If you find beyond a reasonable doubt that the [petitioner] committed a prior sexual offense you may, but are not required to, infer that the [petitioner] had a disposition to commit the same or similar type sexual offenses. If you find beyond a reasonable doubt the [petitioner] had this disposition you may, but are not [re]quired to, infer that he was likely to commit and did commit the crime of which he is accused. Unless you are otherwise instructed you must not consider this evidence for any other purpose.

(RT 1048-49.)

Petitioner argues that the limiting instruction was defective because no evidence was admitted for a limited purpose. (2nd AP at 15.) Petitioner claims the jury should have been expressly advised that the 1961 diagnosis by Dr. Fowle could only be considered to impeach or

11

support the testimony of Dr. Fowle and could not be used to reflect on petitioner's character. (2nd AP at 15.) However, the state court's finding that trial counsel might not wish to emphasize the 1961 evidence and therefore did not seek a limiting instruction was not unreasonable. The prosecution referenced the 1961 diagnosis only twice in 23 pages of testimony. (RT 998-1018; 1040-43.) In addition, the jury was properly instructed that evidence of petitioner's prior sexual offenses must not be used for any other purpose. (RT 1049.) The United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." Garceau v. Woodford, 275 F.3d 769, 774 (9th Cir. 2001), overruled on other grounds by Woodford v. Garceau, 538 U.S. 202 (2003). In fact, the Supreme Court has expressly left open this question. See Estelle v. McGuire, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime").

Finally, even if counsel's failure to seek a limiting instruction fell below an objective standard of reasonableness, petitioner has failed to establish the prejudice prong of Strickland. Petitioner has not demonstrated that but for trial counsel's failure to seek a limiting order as to the 1961 evidence, a different outcome would have occurred. Based on the testimony of Amanda and Leslie, this court's confidence in the outcome is not undermined. In addition, the jury knew petitioner was a convicted felon who admitted molesting Leslie and later burglarizing her home. The testimony concerning petitioner's conduct with Leslie and Amanda was more damaging than the 1961 diagnosis of sexual psychopath-voyeur. Accordingly, the state court's decision with respect to this claim was not an unreasonable application of, or contrary to, clearly established United States Supreme Court precedent.

/////

C. <u>Ineffective Assistance of Counsel: Failure to Object</u>

Petitioner next claims he was denied effective assistance of counsel by the failure to object to testimony concerning the post-molestation experiences of a prior victim.

The state appeals court again found this was a tactical decision on the part of petitioner's trial counsel. (Opinion at 11.) "The record indicates Leslie's testimony was emotional, so this testimony may have served to explain her demeanor and thus was relevant to assessing her credibility. In ruling on the motion for a new trial, the trial court suggested Leslie's presence provided a tactical reason not to object to this testimony." (Opinion at 12.)

"A court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." <u>Strickland</u>, 466 U.S. at 670. Petitioner has not demonstrated that the trial court would have suppressed the evidence if counsel had objected. The trial judge held a hearing before the trial where he heard from three separate witnesses, including Leslie, about alleged conduct by petitioner. (RT 161-230.) At that hearing, in addition to her testimony concerning the molestations, Leslie testified that after the molestations, she looked over her shoulder every day, didn't trust anyone, wouldn't let her children out of her sight, had an eating disorder, and had to fight hard to "take back her life." (RT 186-87.)

Defense counsel attempted to keep this evidence away from the jury. He argued that petitioner's conduct with Leslie was remote in time and dissimilar from the charged offense. (RT 220-21.) Defense counsel further argued that petitioner's conduct was more extreme and egregious with Leslie than the alleged conduct with Amanda, and that Leslie's testimony should not be admitted. (RT 221.) Defense counsel pointed out the differences between the two incidents, i.e. that petitioner had molested Leslie in an automobile, and that there had been no skin to skin contact or exposure of genitals between petitioner and Amanda. (RT 225.) Counsel further noted that petitioner's molestation of Leslie was continuous for about a three year period, where the instant offense alleged one incident only. (RT 225-26.) The trial judge overruled

defense counsel's objections, finding Leslie's testimony "very relevant." (RT 228.) The judge noted the similarities: Leslie and Amanda had quasi-familial relationships with petitioner; both incidents involved conduct in the home; both incidents occurred when both victims were alone; in both incidents, the petitioner entered the victims' bedrooms at night; and, in both cases, petitioner fondled the victims. (RT 229-30.)

Given the judge's adamant view about the admission of this evidence, it was unlikely that he would have sustained defense counsel's objection to the admission of Leslie's post-molestation experiences. However, even if the trial court had sustained such an objection, for the reasons stated in sections (A) and (B), supra, there is not a reasonable probability that the outcome of petitioner's trial would have been different had the court excluded the testimony concerning Leslie's post-molestation experiences. Thus, this claim must also fail.

D. Denial of Motion for New Trial

Petitioner alleges that the trial court violated his right to due process when it denied his motion for a new trial based on newly discovered evidence that Amanda had made a false accusation against her stepfather. Petitioner argues that the newly discovered evidence should have triggered a new trial because the more recent false accusation uncovered Amanda's true goal, which petitioner claims was to "secure her removal back to Los Angeles, with the maximum infliction of trauma on her mother and her mother's family." (2nd AP at 20.) Petitioner contends that the discovery of new evidence which reflects adversely on the credibility of a state prosecution witness may be grounds for federal relief. Benn v. Lambert, 283 F.3d 1040 (9th Cir. 2002).[5]

The state appeals court addressed this claim as follows:

> The new evidence before the court was contained in the declaration of Shannon's new husband, Jason Smith. He detailed disciplinary

---

[5] The Benn court held that habeas relief was warranted because the prosecution withheld multiple pieces of critical impeachment evidence that would have seriously undermined credibility of key prosecution witness, thus violating Brady v. Maryland, 373 U.S. 83, 87 (1963).

14

>problems they had with Amanda. After Amanda moved out, a social worker contacted Smith to investigate charges Amanda had filed, alleging Smith had engaged in child abuse, verbal abuse, and drug abuse. After an interview with Shannon, Smith and Shannon's two other daughters, Smith was notified the charges were unfounded.
>
>The trial court found this evidence was cumulative on the issue of Amanda's credibility because the defense presented ample evidence that she lied. Moreover, the court found credibility problems with the evidence as the investigation of Amanda's complaints did not include an interview with Amanda. While it was unclear exactly what Amanda alleged, there was no indication that she claimed Smith molested her.
>
>The court found it improbable that this evidence would produce a different result on retrial. It found Amanda to be credible and her testimony corroborated by Katie and Leslie. In contrast, it found [petitioner] evasive and nonresponsive. Moreover, the court found the defense had not offered a convincing motive for Amanda to lie about the molestation. She testified she did not want to report the incident; she preferred not to talk about it. There was evidence that it had caused a serious rift in the family. Given the trial court's careful consideration of the motion for a new trial, we find no abuse of discretion in the court's ruling to deny it.

(Opinion at 15-16.)

To obtain habeas relief on the basis of newly discovered evidence, petitioner must show that the evidence would probably produce an acquittal. Quigg v. Crist, 616 F.2d 1107, 1112 (9th Cir.1980), cert. denied, 449 U.S. 922 (1980).

Here, the newly discovered evidence was the proposed testimony of Shannon, Amanda's mother, and Jason Smith, Shannon's husband. Both Shannon and Jason alleged that some time after the trial,[6] Amanda had filed a child abuse claim with CPS that was later determined to be unfounded. In her letter to the court, Shannon questioned the veracity of Amanda's charges against petitioner. (CT 503-04.) Jason's declaration recounted incidents of Amanda lying to him and other family members. (CT 513-15.) Petitioner sought to demonstrate, through this new evidence, that Amanda had a character trait to fabricate complaints of abuse.

---

[6] The trial judge noted this incident occurred about one year after the molest at issue herein. (RT 1202.)

The trial judge noted that the new evidence of a false child abuse claim was in the context of disciplinary problems with Amanda. (RT 1203.) There was no evidence that CPS had interviewed Amanda (RT 1203), nor was any declaration provided by Amanda about the child abuse allegation. The speculative nature of this evidence does not suggest its admission would probably produce an acquittal. The subsequent claim raised by Amanda was not of a sexual nature and does not raise a direct inference that she lied about the actions of petitioner.

Moreover, the jury found petitioner guilty even after Amanda's credibility was undermined. Amanda's great-grandfather Kerr testified that Amanda lied about everything and implied that she lied about petitioner's conduct. (RT 727, 731-32.) Shannon admitted Amanda lied about typical teenager stuff. (RT 684.) Cathy Vick, Amanda's grandmother, testified that Amanda embellished stories. (RT 546.) Amanda admitted she sometimes lied about little stuff. (RT 749-50.) The fact that the jury found petitioner guilty demonstrates that the jury found Amanda to be credible in her complaints about petitioner's conduct. The trial judge correctly noted that the new evidence was cumulative of the defense counsel's effort to characterize Amanda as dishonest. Therefore, this additional new evidence of a subsequent false allegation of child abuse does not suggest its admission would probably produce an acquittal.

Finally, the trial judge placed weight on petitioner's failure to present evidence that Amanda had reason to falsely accuse her grandfather. (RT 1208.) Amanda was a reluctant witness. (RT 595-96.) The trial judge noted there was no evidence of animosity between petitioner and Amanda. (RT 1208.) In the instant petition, petitioner attempts to claim Amanda's motive to lie was that "she wanted to embarrass her mother, escape a rural environment with chores such as hauling wood, and move back to Los Angeles with her father." (2nd AP at 22.) Petitioner provides no evidence in support of this statement. Petitioner also claims that he was known in the family to have a record as a sex molester. However, in her letter, Shannon, Amanda's mother, states: "Yes, I knew about his past. It was not discussed with my children, because I did not have anything to worry about and I never did." (CT 504.)

In light of the above, the trial court's findings that this new evidence was speculative, cumulative and would not have made a difference upon retrial were supported in the record and were not contrary to, or an unreasonable application of, Supreme Court authority.

### E. Cruel and Unusual Punishment

In his final claim, petitioner contends he suffered cruel and unusual punishment as a result of the trial court's refusal to strike one of petitioner's prior convictions for sentencing purposes.[7] Petitioner was 63 years old at the time of sentencing and cannot be considered for parole for 25 years. Petitioner contends that this sentence is effectively a life sentence because it is unlikely he will live to see his first parole eligibility hearing. Petitioner argues that one of his prior qualifying offenses was for non-violent burglary, rendering his 25 year sentence cruel and unusual punishment.

The last reasoned state court decision relating to this claim is the decision of the California Court of Appeal for the Third Appellate District, which rejected, on direct appeal, petitioner's claim that the trial court had abused its discretion in refusing to strike the prior conviction. (See Opinion at 16-19.) The state court rejected the claim, finding the trial court did not abuse its discretion because petitioner had an extensive criminal history, petitioner was unlikely to change his behavior, the current conduct was similar to that of the past offense, his prospects for rehabilitation were "nil," thus, there was a need to protect society, particularly young girls. (Opinion at 18.) The trial court also "found the circumstances in aggravation predominated as [petitioner] took advantage of a position of trust and confidence, he had

---

[7] Petitioner does not allege that the trial court abused its discretion in refusing to strike his prior conviction. Even if he had, such a claim would also be unavailing as it would involve an interpretation of state sentencing law. "It is not the province of a federal habeas court to reexamine state court determinations on state law questions." Estelle, 502 U.S. at 67. So long as a state sentence "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976). Thus, "[a]bsent a showing of fundamental unfairness, a state court's misapplication of its own sentencing laws does not justify federal habeas relief." Christian v. Rhode, 41 F.3d 461, 469 (9th Cir. 1994).

numerous priors of increasing seriousness, and had performed unsatisfactorily on probation before." (Opinion at 18-19.)  Finally, the court found it was not an abuse of discretion to impose such a harsh sentence on a man in his sixties because he "continued to offend as a senior citizen, after extensive counseling, [and] did not portend a successful rehabilitation." (Opinion at 19.)

On August 22, 2002, petitioner filed a petition for writ of habeas corpus with the California Supreme Court raising his cruel and unusual punishment claim.  The California Supreme Court denied that petition without comment on April 30, 2003.  (Answer, Ex. G.)

The state appeals court's findings are supported by the record.  (See also Clerk's Transcript on Appeal (CT), at 397.)  In addition, the Eighth Amendment provides no protection from the sentence imposed.

As noted above, the federal habeas corpus statute provides that habeas corpus relief is unavailable for any claim denied on the merits in State court "unless the adjudication of the claim-- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).  In Lockyer v. Andrade, 538 U.S. 63 (2003), the United States Supreme Court made clear that, in the context of an Eighth Amendment challenge to a prison sentence, the "only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case." Andrade, 538 U.S. at 73 (citing Harmelin v. Michigan, 501 U.S. 957, 1001 (1991); Solem v. Helm, 463 U.S. 277, 290 (1983); and Rummel v. Estelle, 445 U.S. 263, 272 (1980)).  The Andrade Court concluded that two consecutive 25-years-to- life sentences with the possibility of parole, imposed under California's three-strikes law following two petty theft convictions with priors, did not amount to cruel and unusual punishment.  Id. at 77; see also Ewing v. California, 538 U.S. 11 (2003) (holding that a sentence of 25 years to life imposed for felony grand theft under California's three-strikes law did not violate the Eighth Amendment).  "Outside the context

of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." Rummel, 445 U.S. at 272.

In Ramirez v. Castro, 365 F.3d 755 (9th Cir. 2004), the United States Court of Appeals for the Ninth Circuit held, post-Andrade, that a three strike sentence of twenty-five years to life in prison for a third shoplifting offense, a "wobbler" under state law[8], constituted cruel and unusual punishment. In Rios v. Garcia, 390 F.3d 1082 (9th Cir. 2004), the court of appeals distinguished Ramirez, finding that the petitioner in Rios had a "lengthy criminal history," had "been incarcerated several times," and because the strikes used to enhance the petitioner's sentence had "involved the threat of violence." Id. at 1086.

Unlike the petitioners in Rios and Ramirez, in the instant case petitioner's commitment offense is not a "wobbler" under California law; it is a felony. See California Penal Code § 288 (a). In addition, petitioner has a lengthy criminal history. Petitioner sustained two strike convictions: lewd act upon a child in 1982 and first degree burglary in 1986. (CT 397.) He served two years in state prison for the burglary. (Id.) Petitioner was also convicted of possession of marijuana for sale in 1979. His record also reflected eight separate offenses of prowling, the last occurring in 1987. (Id.)

Petitioner's sentence does not fall within the type of "exceedingly rare" circumstance that would support finding that his sentence violates the Eighth Amendment.

For the foregoing reasons, the court will recommend that petitioner's final claim for relief be denied.

In accordance with the above, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty

---

[8] A "wobbler" is an offense that can be punished as either a misdemeanor or a felony under applicable law. See Ferreira v. Ashcroft, 382 F.3d 1045, 1051 (9th Cir. 2004).

days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: June 16, 2005.

UNITED STATES MAGISTRATE JUDGE

1
vick0652.157

20